# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:21 CR 70 MR WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| ARTHUR SHANE DOUVILLE | ) | |
| | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 263), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

## I. Relevant Procedural Background

On August 3, 2021, a thirty-eight count Bill of Indictment was filed against twenty-three individuals. Doc. 3. In that document, Defendant Arthur Shane Douville ("Defendant") was charged with one count of engaging in a conspiracy to possess with the intent to distribute methamphetamine and one count of possessing with the intent to distribute a quantity of methamphetamine.

On October 12, 2021, Defendant filed the Motion to Suppress. Doc. 263. On November 5, 2021, the Government filed its response. Doc. 300.

A hearing was conducted on the Motion to Suppress on November 29, 2021.

## II.  Factual Background

"When material facts that affect the resolution of a motion to suppress . . . are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

### A.  Evidence Presented

At the hearing, the Government called the following witnesses, all of whom are employed by the Haywood County Sheriff's Department: Detective Jordan Reagan (who is also a full-time task force officer with the Drug Enforcement Agency), Sgt. Nathan Deweese,[1] Deputy Jason West, and Sgt. Matthew Trantham. The Government also introduced, without objection, video footage from the dashboard camera on Deputy Deweese's patrol vehicle.

Defendant did not offer any evidence.

---

[1] At the time of the events in question, Sgt. Deweese was a senior deputy with the Haywood County Sheriff's Department. Consequently, this Memorandum refers to his previous rank.

## B.    Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

The indictment in this matter resulted from a multiagency investigation that took place over the course of a year, was led by the Drug Enforcement Agency and the Haywood County Sheriff's Office, and focused on suspected methamphetamine trafficking in Haywood County, Buncombe County, and Jackson County as well as in Georgia. The investigation identified Roberto Illerma Ibarra ("Ibarra") as a suspected source of supply in Georgia, others, including Defendant, as being suspected wholesalers in North Carolina, and still others, including Keith Allen McMahan ("McMahan")[2], as being suspected traffickers or associates of the wholesalers.

On May 6, 2020, Detective Reagan was contacted by a confidential informant who advised that Defendant was at a residence in Jackson County belonging to Justice Godbee and Traci Barnette ("Godbee Residence"), was picking up money, and would be traveling to Georgia to purchase 5 ounces of methamphetamine from Ibarra. The informant further stated that Defendant

---

[2] McMahan, who is also charged in the multidefendant Bill of Indictment, has made a similar motion to suppress with regard to the subject traffic stop. A separate Memorandum and Recommendation is being issued with regard to that motion based on the evidence and arguments presented during a separate hearing.

3

would be traveling to the Guest Inn in Norcross, Georgia to meet with Ibarra, would be returning to the Godbee Residence after he purchased the methamphetamine, and would be operating a blue Acura vehicle.

Law enforcement had observed the blue Acura bearing a temporary plate a couple of days earlier.

In response to the information from the informant, Detective Reagan and one of his colleagues, Detective Phillips, travelled to the Guest Inn in Norcross, Georgia, arriving at approximately 1 AM on the morning of May 7, 2020. They were unable to locate a vehicle matching the description of the blue Acura in the hotel parking lot and therefore attempted to locate a residence they believed to be associated with Ibarra. When they were unable to locate the residence, they returned to the hotel around 2 AM. They searched the parking lot again, saw a blue Acura vehicle with a temporary plate, and began surveilling that vehicle.

At approximately 3 AM, the detectives saw McMahan come out of a hotel room, go to the blue Acura and "mess around in the car," and then return to the room.

At approximately 5:45 AM, McMahan again exited the hotel, and this time drove the blue Acura to a nearby gas station where he met Ameretta Revis ("Revis") and Shauna Conard ("Conard"), who had a black Kia passenger car

4

with two flat tires. McMahan, Revis, and Conard got into the Acura and returned to the hotel.

Detective Reagan and Detective Phillips were following McMahan and, when they returned to the hotel parking lot, saw a red Mustang automobile, which law enforcement believed was operated by Ibarra.

The detectives subsequently observed Defendant, McMahan, and Ibarra walking around the parking lot and moving in and out of their hotel rooms.

At approximately 6:30 AM, both the Acura and the Mustang left the hotel and returned about 30 minutes later.

The detectives also observed two other individuals known to them – Bo Woods ("Woods") and Divette Furman ("Furman") – walking around the parking lot and meeting with Defendant and McMahan. Furman is the mother of another defendant, Ryan Muster. After walking to a restaurant, Woods and Furman got into a separate vehicle and left the area.

A few minutes later, Defendant, Revis, McMahan, and Conard got into the blue Acura and left. Detective Reagan and Detective Phillips attempted to follow but lost the car in the morning traffic.

Detective Reagan was contacted by the confidential informant who advised that Defendant was en route to North Carolina and that the group was leaving the black Kia vehicle in Georgia.

5

Detective Reagan and Detective Phillips then left Georgia and returned to North Carolina where they began conducting surveillance on the Godbee Residence. While there, they observed an unknown black male, Godbee, Defendant, McMahan, Conard, and Revis walking around the yard. The black male left in a truck, and an unknown white male arrived in a different vehicle.

Subsequently, Defendant, Revis, McMahan, and Conard left the Godbee Residence in the blue Acura.

Detective Reagan advised Sgt. Trantham and Deputy Deweese, both of whom had previously been involved in other traffic stops during the larger investigation, of these developments and that Defendant was suspected of transporting a multi-ounce quantity of methamphetamine from Georgia back to North Carolina in the Acura.

Law enforcement personnel then took up positions beside Highway 23/74 eastbound just inside of the Haywood County/Jackson County line.

Deputy West, who was in his patrol vehicle and parked beside the eastbound lane of Highway 23/74, was the first to encounter the blue Acura. Using his radar, Deputy West clocked the vehicle travelling at 65 miles per hour in a 55 miles per hour speed zone.

Deputy Deweese, whose patrol vehicle was also parked near eastbound Highway 23/74, encountered the blue Acura shortly thereafter, and began pursuit. He caught up to the blue Acura and activated his lights and the blue

Acura pulled over. Deputy Deweese testified that his vehicle and the blue Acura were traveling approximately 64 to 65 miles per hour at the time he caught up with the Acura.

Other law enforcement personnel were also in the area and several officers appeared at the scene shortly after the Acura came to a stop, including Lt. Mease, Deputy West, Sgt. Trantham, Detective Reagan, and Detective Phillips. The video from Deputy Deweese's dashboard camera captured the ensuing interactions between law enforcement personnel and the occupants of the blue Acura.[3]

Defendant was in the driver's seat, Revis was in the front passenger seat, McMahan was in the back seat behind Revis, and Conard was in the back seat behind Defendant.

Deputy Deweese approached the Acura on foot and initially identified Douville, Revis, and Defendant. He knew these individuals from previous traffic stops or from "dealing with them in some drug-activity situations." Deputy Deweese noted that Defendant was nervous to the point that he could hardly speak to Deputy Deweese and that his hands were shaking very heavily.

---

[3] Because the video system in Deputy Deweese's patrol car recorded events that occurred prior to the activation of the vehicle's lights or sirens, the video footage begins before Deputy Deweese actually observed the blue Acura. The stop itself commences approximately two minutes after the recording begins.

7

Such a response was not normal for Defendant and made Deputy Deweese suspicious.

Lt.. Mease, who had approached the vehicle from the passenger side, signaled Deputy Deweese that Conard was asleep in the back seat and she was awakened and also identified.

Deputy Deweese then returned to his patrol car where he began running warrant checks on the occupants and checking Defendant's driver's status through the CJLEADS system, a North Carolina database containing criminal records.

Meanwhile, Sgt. Trantham, a K-9 handler who was also on the scene, was interacting with the occupants of the vehicle, including obtaining paperwork for the vehicle from Defendant. Sgt. Trantham noted that Defendant was visibly nervous and that his hands were shaking significantly. Sgt. Trantham testified that he had interacted with Defendant several times during vehicle stops over a period of years and had never known Defendant to act so nervous. Sgt. Trantham also testified that this presentation made him suspicious that methamphetamine was contained in the vehicle.

Deputy Deweese exited his patrol vehicle, obtained the paperwork for the Acura from Sgt. Trantham, and placed it on Deputy Deweese's patrol car. The paperwork remained in this position while other events were transpiring.

McMahan, who also appeared nervous and was fidgeting and moving around in the backseat, was asked multiple times to keep his hands where they could be seen and away from a baseball bat that was visible in the rear passenger area.

Defendant was removed from the vehicle, patted down by Deputy West, and found to have some tattoo needles and something suspicious in his groin area.[4] Defendant was then handcuffed.

The other occupants were likewise removed from the vehicle. In the process, officers noticed that McMahan was holding something in his left hand and was attempting to crush it. Upon McMahan's exit from the vehicle, Deputy Deweese grabbed McMahan's hand and removed the item, which was revealed to be a pack of cigarettes that contained shards of suspected methamphetamine. McMahan was then handcuffed.

Deputy Deweese returned to his patrol car and continued to check for warrants on the occupants and to verify that there were no irregularities with the vehicle's registration.

During this time and after the occupants and the officers had stepped away from the Acura, Sgt. Trantham retrieved his canine from his vehicle and had the dog conduct an open-air stiff around the Acura. The dog jumped onto

---

[4] The suspicious item turned out to be Defendant's belt buckle, which was in an unusual position.

9

the driver's side door (which had an open window) multiple times and ultimately alerted on the driver's side by sitting down to indicate the possible presence of controlled substances. Sgt. Trantham then opened the door to the Acura and allowed the dog to access the interior of the vehicle.

Approximately 15 minutes after the stop had commenced, Deputy Deweese received confirmation that the car was appropriately registered and that no active warrants existed for any of the occupants.

By this time, law enforcement had begun to search the blue Acura. Some officers conducted a hand search of the interior of the car, while Sgt. Trantham obtained a flexible telescoping camera and began to look into the air ducts and the area around the dashboard. Using the camera, Sgt. Trantham saw what appeared to be a bag inside one of the air vents. He subsequently removed a portion of the dashboard or console cover and recovered a canvas bag. Inside was a cellophane bag wrapped in black electrical tape. Law enforcement officers opened the cellophane bag and found suspected methamphetamine and suspected marijuana.

## III.   Analysis

"A traffic stop constitutes a seizure under the Fourth Amendment and is subject to review for reasonableness." <u>United States v. Hill</u>, 852 F.3d 377, 381 (4th Cir. 2017) (internal quotation marks omitted).

"Because a traffic stop is more akin to an investigative detention than a custodial arrest, . . . the constitutionality of such a stop" is analyzed "under the two-prong standard enunciated in <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." <u>United States v. Williams</u>, 808 F.3d 238, 245 (4th Cir. 2015). Specifically, courts consider "(1) if the stop was legitimate at its inception, and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." <u>United States v. Bowman</u>, 884 F.3d 200, 209 (4th Cir. 2018) (internal quotations and citations omitted).

## A.   The Basis for the Stop

"[I]t is elementary that the authorities are entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband, and they may briefly detain and investigate such a vehicle and its occupants." <u>United States v. Singh</u>, 363 F.3d 347, 355 (4th Cir. 2004) (citing <u>United States v. Sharpe</u>, 470 U.S. 675, 687-88 (1985) (holding stop of vehicle and subsequent twenty-minute investigatory detention was reasonable where authorities observed circumstances indicative of drug trafficking).

Law enforcement personnel may also stop a vehicle when they have probable cause to believe that a traffic violation has taken place. <u>Bowman</u>, 884 F.3d at 209 (citing <u>Whren v. U.S.</u>, 517 U.S. 806, 810 (1996) (the initial "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred")).

In this case, Deputy Deweese testified that he pulled the Acura over as part of the larger investigation into drug trafficking and also on the basis of speeding. It is not necessary, however, in light of other evidence, to determine whether evidence of Defendant's suspected drug trafficking activity – standing alone – was sufficient to create reasonable suspicion to justify the stop.

Specifically, the Government's evidence indicated clearly that the blue Acura was traveling at 65 miles per hour in a 55 miles per hour speed zone. This information provided law enforcement with probable cause to stop the vehicle. See United States v. Melendez, 505 Fed.Appx. 233, 235 (4th Cir. 2013) (police had probable cause for a traffic stop when defendant was travelling 76 miles per hour in a 65 miles per hour zone and made an unsafe lane change); United States v. Pankey, No. 3:16cr79, 2016 WL 6647939, at *3 (E.D. Va. Nov. 9, 2016) (stop of vehicle justified by vehicle's speed of 78 miles per hour in a 70 miles per hour zone). The fact that the officers were also interested in searching the vehicle for suspected drugs did not invalidate this authority. See United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). ("Any ulterior motive a police officer may have for making the traffic stop is irrelevant").

## B.    The Extension of the Stop

Defendant's primary argument is that the traffic stop was unlawfully extended and, consequently, that the items recovered from the car should be suppressed.[5]

An investigatory stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of the stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005).

An initial question here is whether the mission of the stop should be considered traffic enforcement or the investigation of potential drug trafficking. On that point, while the Government's evidence indicated that the primary goal of law enforcement was to further the investigation of the alleged drug conspiracy, as the parties have argued the issues based on the premise that the mission of the stop was to address the traffic violation, and further as the undersigned, as discussed above, finds that the traffic violation authorized the stop, this Memorandum will likewise consider the initial purpose of the stop as being to address the speeding violation.

---

[5] In his written Motion, Defendant also argues that Sgt. Trantham's dog did not alert to any drugs in the car except those found on McMahan and a small quantity of smoked marijuana in the glovebox and suggests that an officer gave the dog cues to alert. The evidence presented during the hearing, however, did not indicate Sgt. Trantham or any of the other officers on the scene improperly directed or cued the dog to give an alert.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355 (internal citations omitted).

"An officer's inquiries into matters unrelated to the justification for the traffic stop…do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009); see also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (quoting United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011) (internal quotation marks omitted) (an "officer's focus must remain on the bases for the traffic stop, in that the stop must be 'sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure'").

"Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354; see also Caballes, 543 U.S. at 407 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful

if it is prolonged beyond the time reasonably required to complete that mission").

A law enforcement officer may prolong a stop beyond its original purpose, but only with additional authorization; "an officer cannot investigate 'a matter outside the scope of the initial stop' unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity." Palmer, 820 F.3d at 649-50 (citation omitted); Rodriguez, 575 U.S. at 355 (an officer may not conduct unrelated checks "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").

> Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." *See Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (internal quotation marks omitted). As we recently explained in *United States v. Williams,* the articulated factors supporting reasonable suspicion during a traffic stop "must in their totality serve to eliminate a substantial portion of innocent travelers," and also demonstrate a connection to criminal activity. *See* 808 F.3d 238, 246 (4th Cir.2015) (internal quotation marks omitted).

> Id. at 650.

In this case, the evidence indicates that approximately 15 minutes elapsed from the time the Acura was stopped until warrant checks on all four occupants had been completed and the validity of the vehicle's registration had

15

been confirmed. The Government's witnesses stated that, in their experience, this amount of time is routinely required to complete a traffic stop, particularly one involving multiple persons and a vehicle with a temporary tag and that takes place during business hours when dispatch is typically busier.

Defendant does not appear to challenge this proposition generally but argues that law enforcement was not authorized to extend the stop past this initial 15-minute period.[6]

The Government contends that reasonable suspicion to extend the stop accrued shortly after the encounter began. In particular, the Government argues that when the information the officers gained after they approached the blue Acura is coupled with law enforcement's information concerning the activities of Defendant and McMahan the night before, the officers had reasonable suspicion to extend the stop. The undersigned agrees.

Over the preceding hours, law enforcement had received information from a confidential informant regarding Defendant's trip to Georgia for the purpose of purchasing methamphetamine and bringing it back to North

---

[6] The Government suggests that reasonable suspicion to extend the stop existed even before the stop occurred, based on the information law enforcement had obtained regarding Defendant's whereabouts and activities the night before. This argument is tantamount to an argument that law enforcement had reasonable suspicion to stop the Acura for suspected drug activity regardless of any observed traffic violations. As the parties have argued the issues based on the premise that the vehicle was stopped for speeding, the undersigned does not reach this issue.

Carolina. Detective Reagan and Detective Phillips, acting on that information, had traveled to Georgia and observed Defendant and McMahan and their interactions with Ibarra, who was a suspected source of supply in Georgia.

While Detective Reagan and Detective Phillips did not observe narcotics or hand-to-hand transactions during their surveillance, the events they did see corroborated and were consistent with much of the information provided by the confidential informant, including the specific hotel and town where Defendant was traveling, that he would be meeting with Ibarra, that Revis and Conard had joined Defendant and McMahan, and that the group was returning to the Godbee Residence. This information was communicated to other law enforcement officers prior to the stop such that the officers, including a canine unit, were waiting for the blue Acura when it entered Haywood County.

This background, coupled with the extreme and unusual nervousness of Defendant and the officers' knowledge that at least some of the occupants in the vehicle had been involved previously with drug activities, provided reasonable suspicion for the extension of the stop. See United States v. Jordan, 952 F.3d 160, 166 (4th Cir. 2020) (police officer had reasonable suspicion of drug distribution, and therefore did not violate Fourth Amendment when he prolonged traffic stop for 11 minutes to wait for back-up before walking a drug detecting dog around vehicle where federal agents told the officer that defendant was suspected of drug trafficking, that others involved in the same

17

scheme had been found with firearms, that defendant had been identified as a main supplier, that warrants had been issued for defendant's cell phone and truck, and that federal agent had observed defendant's suspicious activities earlier in the day); United States v. Melvin, No. 5:17-CR-00357-FL-1, 2019 WL 2252013 (E.D.N.C. Feb. 15, 2019), recommendation adopted, 2019 WL 1761544 (E.D.N.C. April 22, 2019) (officer had both reasonable suspicion and probable cause to extend a traffic stop to conduct a dog sniff where stopping officer, through the collective knowledge of DEA task force officer, had specific information to believe that defendant was involved in drug trafficking at the time of the stop).

Additional bases for extending the stop developed soon thereafter when McMahan was discovered to be in possession of suspected methamphetamine and when Sgt. Trantham's K-9 unit gave a positive alert to the presence of controlled substances in the Acura.

"Probable cause to search a vehicle exists when 'reasonable officers can conclude that what they see, in light of their experience, supports an objective belief that contraband is in the vehicle.' This standard is satisfied when a police officer lawfully searches a vehicle's recent occupant and finds contraband on his person." United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (quoting United States v. Ortiz, 669 F.3d 439, 446 (4th Cir. 2012)).

Here, when McMahan exited the Acura, he appeared to be holding something in his hand. That item was recovered and was found to contain what officers believed to be methamphetamine.[7] This discovery, which was made before the relevant information regarding outstanding warrants and the vehicle's registration was gathered and only minutes after the stop had begun, supported probable cause to search the vehicle and extend the stop.[8]

Further, the positive alert by Sgt. Trantham's K-9 likewise occurred before routine information associated with a traffic stop had been verified. The alert created a second and independent basis for probable cause to search the vehicle and to extend the stop. See United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) ("Having the trained dog sniff the perimeter of Jeffus' vehicle, which had been lawfully stopped in a public place, did not of itself constitute a search. When the dog 'alerted positive' for the presence of drugs, the officer was

---

[7] Defendant has not argued that the cigarette pack was seized from McMahan unlawfully. McMahan has raised such an argument, and it is addressed in the Memorandum and Recommendation being issued in his case.

[8] Defendant also argues that the scope of the ensuing search of the Acura exceeded the time and scope of what was reasonable without a warrant. The undersigned does not find that argument to be persuasive. See United States v. Morgan, No. 5:16-CR-108-D, 2016 WL 7373786, at *6 (E.D.N.C. Dec. 19, 2016) ("[p]robable cause to search a vehicle [did] not dissipate simply because it [took] a long time to complete a reasonable and thorough search") (quoting United States v. Hernandex-Mendoza, 600 F.3d 971, 976 (8th Cir. 2010)); see also United States v. McCarty, 612 F.3d 1020, 1026 (8th Cir. 2010) ("A search of every part of the vehicle that might contain contraband was authorized, because drug traffickers are known to stow contraband in secret compartments").

given probable cause for the search that followed.") (citing <u>United States v.</u>
<u>Place</u>, 462 U.S. 696, 707 (1983)).

## IV.  Recommendation

Based on the foregoing, the undersigned respectfully **RECOMMENDS**
that Defendant's Motion to Suppress (Doc. 263) be **DENIED**.

Signed: February 16, 2022

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).